```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA

KAI HAMBURG                                        CIVIL ACTION

VERSUS                                             NO. 10-3071

LIFE INSURANCE COMPANY OF                          SECTION "F"
NORTH AMERICA
```

## ORDER & REASONS

Before the Court are merits briefs addressing the question of whether Life Insurance Company of North America abused its discretion when it denied Kai Hamburg's request for long-term disability benefits.  The Court finds that it did not.[1]

## Background

This case arises out of defendant's denial of long-term disability benefits.  Kai Hamburg, a data-control specialist with Tulane University,[2] claims that he became disabled after a work-related car accident on February 16, 2007, which left him with injuries to his neck, back, and right shoulder.  He also suffers from depression.

After Life Insurance Co. of North America (LINA) denied him long-term disability benefits under a group disability insurance policy it issued and administered for Tulane, Hamburg sued.  This

---

[1] The parties agree that this case may be resolved on the briefs.

[2] His position requires him to occasionally lift, carry, push, or pull ten pounds, but otherwise requires "mostly sitting," and "may involve standing or walking for brief periods of time."

Court must resolve the lawsuit under the Employee Retirement Income Security Act: did LINA abuse its discretion in denying Hamburg benefits?

I.

*The Plan*

The plan under which Hamburg seeks benefits defines "disabled":

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either:
>
> 1) unable to perform the material duties of his or her Regular Occupation or a Qualified Alternative; or
>
> 2) unable to earn 80% or more of his or her Indexed Earnings.

The plan defines "regular occupation" as "the occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, [LINA] will consider the duties of the occupation as it is normally performed in the general labor market in the national economy." A qualified alternative is

> An occupation that meets all of the following conditions:
> (1) the material duties of the occupation can be performed by the Employee based on his or her training, experience or education;
> (2) it is within the same geographic area as the Regular Occupation the Employee holds with the Employee on the date the Employee's Disability begins;
> (3) a job in that occupation is offered to the Employee by the Employer; and the wages for that occupation, including commissions and bonus are 80% or more of the Employee's

Indexed Covered Earnings.

A claimant must be continuously "disabled" under the policy for a 90-date period before disability benefits may be payable. Once this 90-day period is satisfied, a claimant is temporarily entitled to long-term disability benefits.[3]

## II.

### *Denial of Benefits*

Hamburg submitted a claim for long-term disability benefits on December 11, 2007. He described his condition as "Cervical and Lumbar (including L5 nerve root) injuries/radioculapathies and related pains." He listed his date of injury as February 16, 2007, and his last day worked as November 16, 2007. He described his cause of injury as "Car Accident// Rear Ended on I-10W" and indicated that he was receiving worker's compensation benefits in the amount of $610.00 a week beginning on November 19, 2007.

Early records show that Hamburg suffered from a lumbar radiculopathy on the right side involving the L5 nerve root. Dr. Charles Billings, an orthopedic surgeon who was the treating physician, summarized some of the early facts of Hamburg's injury: he was struck in the rear while stopped in traffic; the airbag did not deploy. Hamburg did not seek emergency room treatment. He was not in a formal therapy program. A steroid injection was of some

---

[3] Once a claimant has received 60 months of long-term disability benefits, the claimant must meet a more restrictive definition of "disabled" to continue receiving benefits.

help at some point in the months after his accident, but an October 2007 steroid injection did not help.

On November 16, 2007, Dr. Billings further evaluated Hamburg's symptoms as "severe in nature" and recommended that he undergo formal physical therapy. He cautioned that Hamburg would be unable to work at least until the therapy was complete.

Physical therapy notes from Tulane University Hospital and Clinic reflect Hamburg's treatment between November 26, 2007 and December 19, 2007. On November 26, 2007, Hamburg rated his pain level as 8 out of 10 and complained of increased anxiety in response to manual therapy targeted at his cervical spine. The therapist noted that Hamburg would "benefit from cont[inued] skilled care to meet goals [and decrease] pain for [an increase] in function." By December 5, 2007, Hamburg was "walking faster, better," rating his leg pain only as 6.5-7 out of 10. He "move[d] [his] neck freely during conversation," and the "motion look[ed] very good," despite neck pain reported at 9 out of 10. Hamburg had "very unusual complaints today, which do not match clinical presentation." On December 19, 2007, it was decided that Hamburg would see a new therapist on his next visit. That therapist was "befuddled as to next step": Hamburg seemed to need manual therapy, but he was not responding well to the current course.

From Dr. Billings' January 3, 2008 clinic note:

> No medical contraindication to part-time light
> or sedentary work activities, but considering

4

> past history and findings as well as diagnostic study results, unlikely to be able to complete a full 8 hour work day. Permanent restrictions anticipated. No heavy lifting, repetitive bending or stooping as well as prolonged sitting or standing regardless of type of treatment elected or clinic course exhibited.

Hamburg was "anxious and tearful."

Dr. Billings also provided a "Medical Request Form" and a "Physical Ability Assessment Form" on January 4, 2008 at the defendant's request. His primary diagnoses were "Cervical disc disease" and "Lumbar disc disease." He advised that Hamburg was "able to attempt return to light sedentary type work." Hamburg was taking Vicodin and Sinequan and his treatment plan included a psychiatric evaluation.

Rina Rivera, a Nurse Case Manager, reviewed Hamburg's file on January 30, 2008 at LINA's request. She noted Hamburg's diagnosis to be mild to moderate cervical and lumbar disc disease; he had continued to work from February 16, 2007, the date of his injury, to November 17, 2007. Rivera explained that Hamburg's medical records failed to contain any pathological reflex results. Hamburg did "not demonstrate any weakness evidenced by Loss of coordination in arms, Bilateral lower extremity BLE weakness/instability, Varying degrees of spasticity, or Impairment of proprioception."

LINA denied benefits some time after January 30, 2008, determining that Hamburg's injuries did not leave him "disabled" as defined by the plan:

> In summary, you claimed you were unable to work fulltime in your regular occupation as a result of neck, back, right shoulder and right leg pain. However, as explained above, the medical evidence contained in your file lacks clinical measurements to support your reported complaints. While we understand you may have symptoms, the medical evidence on file does not substantiate significant impairment. There are no positive clinical measurements to support a degree of functional impairment that would prevent you from returning to work in your regular occupation.

### III.

### *Appeal*

Hamburg appealed LINA's decision on July 29, 2008.  In support of his appeal, Hamburg supplemented his file with recent MRI results and also a November 19, 2008 report from Dr. Gary Glynn, a physical and medical rehabilitation specialist.  A cervical MRI showed "significant increase in the asymmetric disc bulge on the left C5-6, now with a more focal protrusion causing cord contact and anterior nerve root with deformity."  A lumbar MRI included a new finding that the "right neural foramen at L5-S1 which appears to be narrowed due to the disc bulge and hypertrophic facet arthropathy."

Dr. Glynn had reviewed plaintiff's medical records from Dr. Waring, Dr. Billings, Kevin Bianchini, a clinical psychiatrist, and Corales, along with Hamburg's MRI results and examined him for approximately two-and-a-half hours.  Dr. Glynn, noting that Hamburg was continuing to work four hours a day in the same department at

Tulane, surmised:

> I agree with Dr. Corales' suggestion that this is "probably more musculoligametous". It is quite likely that there are psychological factors as defined by Dr. Bianchini's evaluation but the evaluation strongly suggests an excellent effort on the part of the patient and the fact that the exaggeration is somatization and not intentional. I do believe that these are soft tissue problems with some component of myofascial involvement with trigger points. I think it is relatively unlikely that his primary symptoms are related to the disc disease or radiculopathy. I do not believe he is at [maximum medical improvement].
> . . .
> It has been somewhat reassuring to him that it is quite likely that we can improve his symptoms significantly. I do think it is important that he continue to be allowed to work, even if it is four hours per day. We also had a lengthy discussion about the difference between "hurt" and "harm". He seems to have gotten something out of that discussion.

LINA also reviewed an evaluation conducted by Dr. Bianchini, which had been requested as part of Hamburg's worker's compensation claim in April 2008:

> The results of the [personality inventory] are suggestive of psychological complication in the presentation of physical symptom complaints. That is, this patient has elevated levels of symptom complaints like those seen in patients who have poor outcomes due to the presence of psychological complication. This seems consistent with some of the comments made by Dr. Billings. There is not any indication of elevated levels of depression or anxiety.

It was Dr. Bianchini's impression that Hamburg's possible

exaggeration of pain was unintentional but might be suggestive of an unconscious psychological overlay.  He advised a specific plan for a work return.

In processing the appeal, LINA sent the entire file to Dr. Renat Sukhov for an independent peer review.  Dr. Sukhov, who is certified by the American Board of Physical Medicine and Rehabilitation, explained that claimants react in different ways to their illness: some make light of their symptoms, shrugging them off and avoiding care; at the other extreme, others respond to the slightest twitches of the pain or discomfort quickly seeking medical attention.  Dr. Sukhov explained that subjective complaints experienced by Hamburg could be considered in assessing his reported functional limitations.  Dr. Sukhov observed:

> From period 11/16/0[7]-2/15/08 reasonable restrictions for the claimant's diagnosis of chronic low back pain with probable electro-diagnostic evidence of right L5 radiculopathy would include provisions such as avoiding excessive lifting for more than 20lbs and pushing and pulling heavy loads above 30-35 lbs frequently.  There was no physician supported evidence of functional deterioration from 2/16/08 and beyond.

Dr. Sukhov completed an addendum to clarify his proposal on Hamburg's work restriction:[4]

---

[4] Dr. Sukhov summarized what he understood Dr. Billings' January 4, 2008 recommendation to be: "No overhead work, no work with arms extended, no prolonged sitting or standing, limited computer work, no lifting greater than 10 pounds. [H]e may be able to attempt to return to work in a light or sedentary capacity, however medication may impair work.  (Vicodin for pain

> Based on review of the medical information relating to the neck, back and shoulder pain, restrictions and limitations, as noted by Dr. Billings, are supported for the time period of 11/16/07-2/15/08. The claimant is not functionally capable of full time sedentary capacity from 11/16/07-2/15/08. The claimant is functionally capable of performing full time sedentary work from 2/16/08 forward.

LINA sent Hamburg's file to Dr. John Mendez for an internal physical assessment and review. Dr. Mendez concluded that the original assessment was correct, as there remained no time-concurrent objective medical documentation to support the restrictions for the time period of November 16, 2007 through February 16, 2008 and forward. Dr. Mendez explained:

> Examples of this could include range of motion inclinometry and/or significant muscle strength deficits by manual muscle testing. Dr. Billing's 11/5/07 note describes reduced cervical spine range of motion/ROM, not otherwise quantified. His 1/4/08 note lists multiple restrictions, but no supporting documentation of measured cervical or lumbar or extremity strength deficits. He notes medication may impair work, but does not provide supporting clinical measurement of this, as could be obtained from a comprehensive mental status exam. Absent such documentation, no work restrictions are medically supported.

On April 4, 2009, LINA notified Hamburg that it affirmed its decision to deny benefits.

---

and Sinequan for depression and anxiety)."

9

IV.

*Lawsuit*

After exhausting all administrative appeals, Hamburg sued LINA on September 15, 2010.  This case must be evaluated on the basis of the administrative record.[5]  The only question to be resolved is whether LINA acted with an abuse of discretion in denying Hamburg long-term disability benefits.  Their dispute turns on LINA's finding that Hamburg is not "disabled."

## **Law & Analysis**

I.

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. § 1001 et seq.; § 1132(a)(1)(B)).  When reviewing a denial of benefits made by an ERISA plan administrator, the Court applies a de novo standard of review, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115

---

[5] The parties disputed whether a Social Security Administration decision finding the plaintiff disabled should be part of the administrative record.  The Court rejected Hamburg's argument that the Court, during its review, should supplement the record with the SSA decision or, alternatively, should remand the entire case for LINA's belated consideration of the SSA decision.  Instead, the Court found that the administrative record is complete and that supplementation of the record on the eve of merits resolution would be improper.

(1989).  The parties agree that the plan here empowers LINA with discretionary authority to determine eligibility for benefits and to construe the plan's terms.  Accordingly, this Court must apply an abuse of discretion standard to review LINA's decision to deny Hamburg's claim for long-term disability benefits.[6]  See id.

In analyzing whether LINA as plan administrator abused its discretion, "the law requires only that substantial evidence support a plan fiduciary's decision, not that substantial evidence exists to support the employee's claim of disability."  See Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262, 274 (5th Cir. 2005).  "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary or capricious," the Fifth Circuit instructs, "it must prevail."  Corry, 499 F.3d at 398-99 (citation omitted).  The Fifth Circuit counsels reasonableness:

> Substantial evidence is more than a mere scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . An arbitrary decision is one made without a rational connection between the known facts and the decision or between the facts and the evidence. . . . Ultimately, "[the Court's review] of the administrator's

---

[6] Different terms have been used to describe what amounts the same standard.  Some courts refer to the standard as "arbitrary and capricious," or an inquiry into whether the administrator's decision was "reasonable and impartial."  The Court does not find a material difference in how the caselaw has used these terms.  See MediTrust Fin. Servs. v. The Sterling Chems., 168 F.3d 211, 214-15 (5th Cir. 1999) ("In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously").

>          decision need not be particularly complex or
>          technical; it need only assure that the
>          administrator's decision fall somewhere on a
>          continuum of reasonableness-even if on the low
>          end."

Id. (internal citations omitted).

## II.

### A.

Hamburg presses that the evidence available to LINA both before and after its decision to deny benefits supports the conclusion that he cannot perform either his "regular occupation" with the employer or a "qualified alternative," as those terms are defined in the plan.  Hamburg maintains that the decision to deny long-term benefits flouts the opinion of his treating physician, Dr. Billings, and improperly relies upon the opinion of a peer-review physician who arbitrarily concluded that Hamburg was incapable of full-time sedentary work only during the 90-day period, and not after.  Hamburg stresses that had the peer-review physician found that he was disabled after February 16, 2008, the last day of the 90-day period, LINA would have had to pay benefits.[7]

---

[7] Hamburg urges that the Court must measure the conflict of interest that arises from the dual role of an entity acting as an ERISA plan administrator and also as a payer of plan benefits, as here, as a factor in determining whether the plan administrator has abused its discretion in denying benefits.  Glenn, 554 U.S. at 109-10; see Conkright v. Frommert, 130 S. Ct 1640, 1647 (2010) (noting that under Glenn, "a systemic conflict of interest does not strip a plan administrator of deference.").  But the U.S. Court of Appeals for the Fifth Circuit instructs that a conflict

---

of interest is just one factor this Court must consider when reviewing LINA's denial of benefits:

> In reviewing the plan administrator's decision, we take into account . . . several different considerations. These factors are case-specific and must be weighed together before determining whether a plan administrator abused its discretion in denying benefits. Any one factor may act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance.
> The interaction between the factors and the substantial evidence test is a relatively new issue after the Supreme Court's decision in <u>Glenn</u>. We have considered the interplay in only one prior published decision—<u>Holland</u>—in which we found that the conflict of interest was a minimal factor and that the evidence was more than sufficient to support the denial of benefits. However, a reviewing court may give more weight to a conflict of interest, where the circumstances surrounding the plan administrator's decision suggest "procedural unreasonableness."

<u>Schexnayder v. Hartford Life & Accident Ins. Co.</u>, 600 F.3d 465, 465 (5th Cir. 2010) (finding procedural unreasonableness where plan administrator failed to consider Social Security Administration timely provided to it and thus deciding to give more weight to the conflict of interest).

Hamburg presses that the Court should consider LINA's financial interest in its decision to deny benefits, in light of the fact that LINA elicited a seemingly favorable opinion from the peer-review doctor by asking him to comment upon disability during time periods based on the elimination period, thus, Hamburg urges, suggesting the desired response. Although the potential narrow conflict he raises differs from those considered within this circuit, <u>see</u> <u>id.</u> at 469; <u>Holland v. Int'l Paper Co.</u>, 576 F.3d 240, 251 (5th Cir. 2009) (finding insufficient conflict of interest where plan administrator established trust to pay benefits to which it made periodic, irrevocable, non-reversionary payments), the Court "need not decide how much weight should be

13

B.

LINA emphasizes that the administrative record in this matter lacks objective medical evidence to support a finding that Hamburg is incapable of performing his occupation as a data-control specialist. Numerous physicians, including Hamburg's treating physicians, have concluded that he was capable of performing his sedentary occupation. Even Dr. Billings noted that as of January 4, 2008 Hamburg was "able to attempt return to light sedentary type work."

LINA stresses that ERISA does not require it to blindly rely on subjective assessments made by Dr. Billings regarding Hamburg's ability to work. This is especially true in this case, LINA asserts, because other physicians and experts have all indicated that he is capable of performing a sedentary occupation. LINA maintains that Hamburg cannot rely solely on his diagnosis of degenerative disc disease as sufficient proof that he meets the definition of "disabled" under the policy. Not only have Hamburg's treating physicians concluded that his pain is unlikely to be associated with degenerative disc disease, but regardless, LINA asserts, a diagnosis of a medical condition alone does not always

---

given to this potential conflict here because it is clearly outweighed by the substantial evidence supporting LINA's decision." Crowell v. CIGNA Group Ins. Co., 410 F. App'x 788, 794 (5th Cir. 2011).

merit disability benefits. The Court agrees.

### III.

Based on LINA's reviews and the evidence in the administrative record before LINA at the time it made the final decision to deny Hamburg's claims for benefits, the Court finds that LINA did not act with an abuse of discretion. ERISA permits LINA to review the record as a whole, including contradictory evidence, and then to reach a decision—any decision—that is not arbitrary or capricious. And that is what LINA did here. The substantial evidence before the Court supports LINA's finding that Hamburg could perform his "regular occupation" and ultimately shows that LINA's decision to deny benefits was not arbitrary or capricious: LINA conducted several reviews, including obtaining an independent physician's opinion, as well as conducting an internal physician's review, and a number of doctors, including Hamburg's own, indicated his improvement and ability to perform light-duty sedentary work. Accordingly,

IT IS ORDERED: A judgment will be entered for LINA, dismissing plaintiff's suit with all costs taxed to the plaintiff.

New Orleans, Louisiana, August 29, 2011.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE